COURT OF APPEALS
DECISION
DATED AND FILED

March 22, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP103-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF983

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CORNELIUS D. CAROLINA,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Outagamie County: MARK J. McGINNIS, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Cornelius D. Carolina appeals from a judgment of conviction, entered after a jury trial, and from an order denying his postconviction

motion. Carolina seeks a new trial on several bases, claiming that the circuit court: (1) improperly provided perjury warnings to two witnesses; (2) was objectively biased; and (3) erred by admitting evidence of prior bad acts contained in a presentence investigation report (PSI) from a different case, or, in the alternative, defense counsel provided ineffective assistance for failing to preserve an objection to the introduction of the PSI statements. For the reasons that follow, we affirm.

## BACKGROUND

¶2 In 2017, Carolina was charged in a four-count complaint with robbery of a financial institution, two counts of false imprisonment, and first-degree recklessly endangering safety, all as party to a crime, as a repeater, and with use of a dangerous weapon. The charges arose from Carolina's role in the armed robbery of a Fox Communities Credit Union (the credit union). Witnesses at Carolina's jury trial testified that three assailants entered the credit union holding guns and wearing ski masks to disguise their identities. The assailants forced the tellers to open the bank vault and tied them up with zip ties before fleeing the scene. The witnesses could not identify the suspects, and video of the robbery failed to provide any additional identifying information.

¶3 The State alleged that Carolina was one of the three assailants, and it called several witnesses at trial to connect Carolina to the robbery. As relevant to this appeal, Craig Reynolds, a former employee at the Hollywood Cinema, testified that his friend, John Frost, had admitted to robbing the Hollywood

Cinema as well as a credit union.[1] According to Reynolds, Frost told him that he and his friend "Corn"—identified by Reynolds as Carolina—committed both robberies in the same manner: by holding the employees at gunpoint, zip tying them, and leaving with the money. Frost was also called to testify, but he answered, "I plead the Fifth," to every question, referring to his Fifth Amendment right against self incrimination, and refused to testify further. The State entered into evidence Frost's judgment of conviction from Outagamie County, case No. 2016CF801, showing his conviction for multiple crimes related to both robberies.

¶4 The State also called Robert Losse, one of Carolina's fellow jail inmates, to testify. Losse initially testified that he and Carolina had discussed Carolina's charges, but he did not remember whether Carolina admitted to robbing the credit union, and he gave indirect answers to the prosecution's further questioning on that subject. After the State requested "leeway in asking questions," the circuit court reminded Losse that he was under oath and "subject to the rules of perjury," which exchange we will address in more detail below. Losse subsequently testified that Carolina had admitted to participating in a "bank" robbery and included details of the crime that the State alleged were only known by law enforcement and the perpetrators.

¶5 Stefanie Rolerat, Carolina's live-in girlfriend and the mother of his son, also testified. Rolerat stated that she did not recall when asked whether Frost had told her that he would not testify. The circuit court also issued perjury

---

[1] Although Reynolds did not testify that the credit union was the Fox Communities Credit Union, all parties appeared to agree that there was only one credit union robbery.

warnings to Rolerat in addition to warning her that "all of those telephone conversations are recorded." She thereafter admitted that Frost "said he was not going to testify."

¶6      Carolina testified in his own defense. He denied participating in the robbery of the credit union, but he admitted his involvement in the Hollywood Cinema robbery with Frost and that he was currently serving a sentence for that robbery. In response to Losse's testimony, Carolina explained that Losse was sitting behind him at his initial appearance when the complaint was read, which explained Losse's knowledge of the facts of the crime.

¶7      On cross-examination, the State challenged Carolina's testimony, stating that the court commissioner would not have read the entire criminal complaint at Carolina's initial appearance. The State asked the circuit court to take judicial notice of that fact, but the court refused. Instead, the court "went online" and "pulled … up" the minutes from Carolina's initial appearance, stating to the jury that "it indicates that Court reads complaint. Defendant waives reading of complaint. So those boxes are checked." The court took judicial notice of the minutes and further stated, "What my interpretation of that is probably really doesn't matter." On rebuttal, the State called Court Commissioner Brian Figy. Before Figy testified, the court took judicial notice of Figy's background as a court commissioner and his job duties, which we discuss in more detail below. Figy then testified that if defense counsel or a pro se defendant requests that he read the criminal complaint at an initial appearance, he will read the "charging counts," but he will not "read the body of the criminal complaint where it summarizes the allegations."

¶8     During Carolina's cross-examination, the State also sought to question him using a PSI created for the Hollywood Cinema robbery case. Trial counsel objected to its use, arguing that he had no access to the confidential document, that it is prejudicial, and that "[i]f [he] had known about it, maybe [he] wouldn't have had Mr. Carolina testify." The circuit court initially refused the State's request but later reversed course based on Carolina's testimony.[2] When questioned regarding his statement to the PSI writer that he "sold any drug that was available to [him] … to pay for everyday necessities," Carolina admitted he had sold drugs when he "was a teenager" but not since 2005. The State also inquired about "problems" Carolina had on probation and a probation revocation hearing. The Department of Corrections alleged Carolina lied about a shooting where Carolina was the victim. According to the PSI, he told "someone that [the] shooting was random and then later admitted that [the] shooting was not random," but Carolina responded at trial that "[a]t first I thought it was random. Then I later found out that I was set up." Carolina testified that "[t]he allegations and the [revocation] case was thrown out."

¶9     The jury found Carolina guilty of robbery and false imprisonment but acquitted him on the first-degree recklessly endangering safety charge. The circuit court sentenced Carolina to consecutive sentences totaling twenty years' initial confinement and twenty years' extended supervision.

---

[2] During Carolina's testimony, he stated, "I don't hang out with drug addicts and alcoholics and gamblers." Carolina later testified that he is "not a drug addict. [He] made a stupid decision … to get involved with a robbery but in the entire time [he] was on probation never dropped dirty, never drank a beer, never smoked anything or took any pills, medication, any of that."

¶10    Carolina filed a postconviction motion for a new trial on the grounds that (1) the circuit court impermissibly interfered with Losse's and Rolerat's testimony by providing perjury warnings to them; (2) the court demonstrated objective judicial bias; and (3) his trial counsel was ineffective for not preserving an objection to the prior bad acts evidence contained in the PSI offered to impeach Carolina's testimony.  The court held a ***Machner***[3] hearing and denied the motion. Carolina appeals.

## DISCUSSION

*Perjury Warnings*

¶11    Carolina first argues that his due process right to a fair trial was violated when the circuit court interfered with the testimony of Losse and Rolerat by providing them with perjury warnings.  Carolina argues that under ***Webb v. Texas***, 409 U.S. 95 (1972),[4] the court's "admonishment was a threat that went far beyond a simple warning," and its interference deprived him of due process and a fair trial.

¶12    As an initial matter, we first address the State's argument, citing ***State v. Carprue***, 2004 WI 111, 274 Wis. 2d 656, 683 N.W.2d 31, that we should

---

[3] ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[4] In ***Webb v. Texas***, 409 U.S. 95 (1972), the trial court admonished the only *defense* witness with perjury warnings.  Observing that the court "gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury" and "that the judge's comments were the cause of [the witness'] refusal to testify," the United States Supreme Court held that the warnings had deprived the defendant of due process under the Fourteenth Amendment.  *Id.* at 97-98.  The Court explained, "[I]n light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify."  *Id.* at 98.

not consider the merits of Carolina's argument on appeal because he forfeited it by failing to object to the circuit court's comments at trial. "Forfeiture occurs when a party fails to raise an objection." *State v. Mercado*, 2021 WI 2, ¶35, 395 Wis. 2d 296, 953 N.W.2d 337. Here, there is no dispute that Carolina did not object to the perjury warnings when they were given to either Losse or Rolerat or at any time after the warnings were provided outside the presence of the jury. The parties disagree, however, regarding the applicability of the forfeiture rule. We need not decide this question, as we have the authority to disregard forfeiture arguments and address an allegedly forfeited claim on the merits. *See State v. Erickson*, 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999) ("[T]he [forfeiture] rule is one of judicial administration and ... appellate courts have authority to ignore the [forfeiture]."). We do so here.

¶13 In reaching the merits, we note that "it is entirely proper for a trial judge to warn a potential witness of possible sanctions if the judge perceives that the witness may intend to perjure himself." *United States v. Cavale*, 688 F.2d 1098, 1109 (7th Cir. 1982); *see also United States v. Arthur*, 949 F.2d 211, 215-16 (6th Cir. 1991) ("The district court has the discretion to warn a witness about the possibility of incriminating himself."). "A judge's admonition to a witness can violate *Webb*," however, "if it is 'threatening' and employs 'coercive language indicating the court's expectation of perjury.'" *United States v. Smith*, 997 F.2d 674, 680 (10th Cir. 1993) (quoting *United States v. Harlin*, 539 F.2d 679, 681 (9th Cir. 1976)). We review a circuit court's perjury warning to a witness for an erroneous exercise of discretion. *See Smith*, 997 F.2d at 680; *Arthur*, 949 F.2d at 215-16.

¶14 Here, we conclude that the circuit court properly exercised its discretion by warning Losse and Rolerat about the possibility of incriminating

themselves. When Rolerat testified that she did not remember whether Frost had told her he was not going to testify, the court provided the following warning:

> THE COURT: Again, I don't know if you know this or not. I haven't been told of anything about this. No. 1, all of those telephone conversations are recorded.
>
> [ROLERAT]: That's fine.
>
> THE COURT: I don't know if you know that, but I expect the way [the State] is asking these questions that there's going to be a transcript pulled out momentarily because that's what [the State] does.
>
> [ROLERAT]: Yeah.
>
> THE COURT: The second part of it is you just took an oath. You are subject to the rules of perjury.
>
> [ROLERAT]: Yes.
>
> THE COURT: If you answer questions falsely while you are under oath, you may be charged with a felony crime of perjury; and that's punishable by up to six years in prison for each of those offenses.
>
> [ROLERAT]: Okay.
>
> THE COURT: The reason I interrupted is I'm not interested in getting you involved or getting you in trouble. I wanted to make sure you understood those rights and probably what is likely to come from the State on those telephone conversations. Do you have any questions about that?
>
> [ROLERAT]: No, I don't.

¶15 Prior to his testimony, Losse was also reminded that he was under oath and was provided perjury warnings outside the presence of the jury. When he took the stand and began providing evasive answers, the court provided Losse with similar admonitions:

> THE COURT: You are under oath. You are subject to the rules of perjury, which requires that if you are going to testify you need to testify honestly, true statements. Correct? I want you—I want to make sure you understand that.

8

[LOSSE]: Yeah. No, I understand.

THE COURT: So far I am hearing you ask [the State] on what he means. His questions are pretty clear. So I don't want to get into playing games. I don't want to do other things that I told you will happen, understood? Contempt of court, other things.

[LOSSE]: Yes.

THE COURT: Okay. You are squinting your eyes as if you are confused. We just covered this like five minutes ago.

[LOSSE]: No. I mean I understand what you are saying.

THE COURT: Okay. So your role—What you need to understand is that your role right now is to answer questions, not ask them. Understood?

[LOSSE]: Okay.

THE COURT: Okay. If you decide to answer them, you need to do it honestly or there's going to be some ramifications. Understood?

[LOSSE]: Yes.

THE COURT: Okay. Do you have any questions for me concerning your role today?

[LOSSE]: No.

¶16     The record clearly reflects that the circuit court's admonitions to both Losse and Rolerat were not threatening, intimidating, or coercive and did not interfere with either witness's decision to testify. Any suggestion that the court was threatening or intimidating the witnesses is belied by its statement to Rolerat that "I'm not interested in getting you involved or getting you in trouble." The court appropriately reminded the witnesses that they were under oath and that there were repercussions for giving false testimony. The warnings were in response to the witnesses feigning memory loss and providing evasive answers, yet the court did not indicate that they should testify in one way or another or suggest what the answers to the State's questions should be.

¶17    Further, although Carolina does not argue that Rolerat testified falsely as a result of the circuit court's warnings, he contends the court's interference with Losse's testimony caused Losse to change his testimony and stand by the first statement he made to law enforcement out of fear of the court's threatened "ramifications." The record also belies this argument. The court did not warn the witnesses that they must testify or specify what their answers should be. In fact, the court admonished Losse by stating, "*If* you decide to answer [the questions], you need to do it honestly." (Emphasis added.) Carolina has no right to perjured testimony. In summary, the court properly exercised its discretion by reminding Losse and Rolerat of their oath and the ramifications of a violation of that oath.

*Circuit Court Bias*

¶18    Carolina next argues that the record demonstrates the circuit court was objectively biased.[5] A criminal defendant has a due process right to an impartial judge. *State v. Goodson*, 2009 WI App 107, ¶8, 320 Wis. 2d 166, 771 N.W.2d 385. "We presume a judge has acted fairly, impartially, and without bias; however, this presumption is rebuttable." *Id.* The burden is on the party asserting judicial bias to show bias by a preponderance of the evidence. *State v. Herrmann*, 2015 WI 84, ¶24, 364 Wis. 2d 336, 867 N.W.2d 772. There are two tests to evaluate whether a defendant has rebutted the presumption: subjective and objective. *Goodson*, 320 Wis. 2d 166, ¶8. In this case, Carolina argues only objective bias.

---

[5] We note that the State also argues that Carolina has forfeited this argument. We choose to reach the merits on this claim as well. *See State v. Erickson*, 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999).

¶19    "Objective bias can exist in two situations.  The first is where there is the appearance of bias."  *Id.*, ¶9.  "[T]he appearance of partiality constitutes objective bias when a reasonable person could question the court's impartiality based on the court's statements."  *Id.*  "The second form of objective bias occurs where 'there are objective facts demonstrating … the trial judge in fact treated [the defendant] unfairly."  *Id.* (alterations in original; citation omitted).  "In other words, [courts] inquire into whether a reasonable person could conclude that the trial judge failed to give the defendant a fair trial."  *Herrmann*, 364 Wis. 2d 336, ¶27.  A circuit court's partiality presents a question of law that we review de novo. *State v. Rochelt*, 165 Wis. 2d 373, 379, 477 N.W.2d 659 (Ct. App. 1991).

¶20    According to Carolina, the record reflects the circuit court was objectively biased because it (1) interfered with the testimony of Rolerat and Losse by threatening them with perjury and contempt of court if they continued to testify falsely, (2) investigated evidence from the initial appearance to contradict Carolina's testimony, and (3) vouched for Figy's credibility.  Under these circumstances, argues Carolina, a reasonable person would question the court's impartiality.

¶21    We conclude Carolina has failed to establish that the circuit court was objectively biased.  First, and as addressed above, it was "entirely proper" for the court to provide the perjury warnings to Losse and Rolerat, *see Cavale*, 688 F.2d at 1109, and those warnings did not give the appearance of bias.

¶22    Second, the circuit court did not appear biased by obtaining the clerk's minutes from Carolina's initial appearance.  Courts are allowed some

11

leeway to direct evidence at trial. *See* WIS. STAT. § 906.14 (2019-20)[6] ("The judge may, on the judge's own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called."); *Carprue*, 274 Wis. 2d 656, ¶33. Here, the court did not seek out evidence unprompted; instead, after denying the State's request to take judicial notice of whether court commissioners routinely read criminal complaints at initial appearances, it sought the clerk's minutes as a neutral response to the State's request. The minutes showed support for both Carolina's and the State's positions, as the boxes indicating that the complaint was read and that the reading was waived were both checked. Thus, there was no objective bias based on the court's obtaining the clerk's minutes.

¶23 Third, the circuit court's discussion of Figy and his job duties does not demonstrate objective bias. Before Figy testified, the court stated in part:

> First off, Commissioner Brian Figy has been a court commissioner here for a lot of years. I know it's got to be close to 20. I am sure he will tell you that. We have four court commissioners in Outagamie County. A court commissioner is a judicial officer. They are not elected like judges are, but they are hired, and they do court commissioner work, which includes putting on a black robe and sitting on a bench and handling cases just like we do.
>
> Commissioner Figy is the primary court commissioner, and what that means is he kind of does everything and in my opinion is sort of the lead person down there….
>
>  ….
>
> I know earlier [the State] wanted me to take judicial notice of what Commissioner Figy did or didn't do on a particular case. He is here to provide testimony on what he did.

---

[6] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

The court also advised the jury, "I tell Commissioner Figy all of the time I give him credit because he handles hundreds and hundreds of cases every day where I get to focus on one case today and handle this trial."

¶24    Carolina argues that the circuit court "improperly vouched for [Figy's] credibility" by "essentially testif[ying] as to the commissioner's work history, tenure, job responsibilities, supervisory role over other court commissioners, the business of his job, and how he [handles] hundreds of cases each day." Carolina fails to provide any legal support for his position that the court could not take judicial notice of these facts. We conclude that while Figy could have testified as to his own work history and job duties, the record does not reflect that the court improperly vouched for his credibility, and Carolina fails to overcome the presumption that the court was not biased.

*Admission of Prior Bad Acts*

¶25    Finally, Carolina argues that the circuit court erred by admitting evidence of prior bad acts contained in the PSI from his sentencing in the Hollywood Cinema case. On this issue, the State again claims that Carolina forfeited this argument, and we agree. *See **State v. Eugene W.***, 2002 WI App 54, ¶13, 251 Wis. 2d 259, 641 N.W.2d 467 ("To avoid [forfeiture], a party must raise an issue with sufficient prominence such that the trial court understands that it is called upon to make a ruling."); ***Townsend v. Massey***, 2011 WI App 160, ¶25, 338 Wis. 2d 114, 808 N.W.2d 155 ("[T]he forfeiture rule focuses on whether particular arguments have been preserved, not on whether general issues were raised before the circuit court.").

¶26    Defense counsel did object to using the PSI for cross-examination purposes, and the circuit court initially sustained that objection. However, the

court ultimately allowed the use of the PSI statements for impeachment purposes based on Carolina's testimony, and defense counsel renewed his objection, arguing that it was "unfairly prejudicial based upon the timing." On appeal, Carolina now argues that it was error for the trial court to admit the PSI statements because (1) the statements were not relevant; (2) the statements were unfairly prejudicial because the evidence "carried a danger of painting Carolina as a bad guy who sold drugs"; and (3) the statements were inadmissible under *State v. Crowell*, 149 Wis. 2d 859, 440 N.W.2d 352 (1989).[7] Defense counsel did not object on these bases; thus, Carolina has forfeited these arguments.

¶27 In general, if a claim is forfeited, we address it from an ineffective assistance of counsel posture. *Erickson*, 227 Wis. 2d at 766. That framework is well known: the defendant must demonstrate that counsel's failure to object constituted deficient performance and that the deficient performance prejudiced the defendant. *State v. Maloney*, 2005 WI 74, ¶14, 281 Wis. 2d 595, 698 N.W.2d 583 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). We will not upset the circuit court's findings of fact unless they are clearly erroneous, but we review whether those facts satisfy the deficiency and prejudice components de novo. *Id.*, ¶15. We need not address both prongs of the *Strickland* test if the defendant fails to make a sufficient showing on one. *Strickland*, 466 U.S. at 697.

---

[7] Carolina argues that, initially, his trial counsel objected to the PSI "because (1) the evidence constituted compelled statements made for the purpose of the PSI which was a confidential document; and (2) because any probative value of those statements was outweighed by the prejudicial effect of admitting the evidence." The State challenges Carolina's description of defense counsel's reasoning, noting that counsel argued unfair prejudice based on "timing" and clarified that "[i]f [counsel] had known about it, maybe [he] wouldn't have had Mr. Carolina testify." We agree that counsel's argument at trial is different from the unfair-prejudice argument that Carolina now makes on appeal.

¶28  We conclude that Carolina was not prejudiced by defense counsel's claimed deficient performance in failing to object to the use of the PSI statements on the grounds that Carolina now argues. To demonstrate that counsel's performance prejudiced his defense, Carolina "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A probability sufficient to undermine confidence exists when there is 'a substantial, not just conceivable, likelihood of a different result.'" *State v. Cooper*, 2019 WI 73, ¶29, 387 Wis. 2d 439, 929 N.W.2d 192 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)). It is not sufficient to show that the court would have sustained defense counsel's objection to the PSI statements; instead, Carolina "must show a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different." *State v. Delgado*, 194 Wis. 2d 737, 751, 535 N.W.2d 450 (Ct. App. 1995).

¶29  Carolina has not established that the result of the trial would have been different absent the use of his PSI statements. Overall, Carolina admitted to selling drugs but testified that it occurred when he was a teenager. He admitted to being the victim of a shooting and being subject to revocation for allegedly lying to law enforcement about that shooting. He explained, however, that he originally thought the shooting was a random act—meaning he did not lie—and that the case was "thrown out." Therefore, we agree with the State's categorization of the PSI statements as "benign" and "innocuous." The PSI statements are certainly less serious than the allegations regarding Carolina's role in the credit union robbery; thus, the risk was low that the PSI statements would have an unfairly prejudicial effect on the result of the trial. The evidence at trial included Carolina's own admission that he committed the Hollywood Cinema robbery, which was similar

and involved the same suspects, and Reynolds' testimony that Frost admitted that he and Carolina committed both robberies. Given this and other evidence presented, it is not reasonably probable that the information contained in the PSI alone would have impacted the verdict. Carolina has failed to establish ineffective assistance of counsel entitling him to a new trial.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.